State Bank of Eastman, Respondent, vs. Rawson, imp., Appellant.

*December 12, 1923—January 15, 1924.*

*Contracts: Original promise to pay debt of another: Evidence: Sufficiency: Secondary liability: Statute of frauds.*

1. In an action by a bank against defendant and his tenants on the theory of a partnership to recover funds advanced to the tenants on their individual notes, the evidence is *held* insufficient to warrant a finding that defendant had made any original promise to become jointly or severally liable on the notes sued on. p. 429.
2. Even if defendant had promised to assume liability for advancements made to the tenants, such promise was void under the statute of frauds because not in writing. p. 433.

Appeal from a judgment of the circuit court for Crawford county: S. E. Smalley, Circuit Judge. *Reversed.*

Appellant *Rawson,* living in Iowa, owned a 200-acre farm in Crawford county, Wisconsin, and January 31, 1919, he made a written agreement with the defendants *Ed Williams* and wife providing substantially as follows:

1. *Rawson* agrees to rent his 200-acre farm (describing it) to the others for a period of time to continue until either party shall notify the other of his intention to quit; such notice to be given not later than September 1st, to take effect March 1st.

2. The Williamses agree to do all farm work and furnish all tools and machinery.

3. "Each party agrees to furnish half of the grain, hay, and stock and to share equally the gains and losses which result from same."

4. Provides for no change in fences, buildings, etc., without *Rawson's* consent.

5. Williamses agree to keep all fences in good repair.

6. The Williamses are to do all they can in the way of killing weeds, and also not to sell any hay or grain without consent of *Rawson.*

7. "Each party is to receive half of what the farm pro-

duces, such as crops, live stock, chickens, eggs, orchard, etc.; also each party is to stand half of the running expenses of the farm, such as nails, staples, or any grain, seed, hay, or stock that has to be bought," etc.

8. *Rawson* to furnish a reasonable amount of fuel to be designated by him.

9. The Williamses to harvest and gather all crops, fruit, etc., and to take the best care possible of same.

This was signed by the three. An inventory was taken on February 1st of the live stock, poultry, etc., at an aggregate value of $2,500; also specifying 800 bushels of oats and barley, thirty bushels of wheat, corn, and fodder, and four tons of hay as being on the farm.

At the time of the making of the agreement the defendants *Rawson* and *Ed Williams* went to the plaintiff bank, borrowed the sum of $600, and gave a judgment note signed by the two and due in six months. This note as presented on the trial had indorsed as of June 1, 1920, "Interest paid to January 31, 1920," and was stamped on the face, "Paid November 23, 1921," but by whom such payments were made does not appear in the record.

The proceeds of this note were deposited to the account of the defendant *Ed Williams* in said bank and he thereupon gave a check for $300 to the defendant *Rawson,* who cashed it. Statements were made from time to time, generally monthly, by the defendants Williams to *Rawson* as to the receipts and payments on account of the farm.

This action was commenced in January, 1922, upon eleven separate causes of action. The complaint alleged, as applicable to all causes, the ownership by *Rawson* of the farm and an undivided half interest in the personal property thereon; the taking of the farm by the defendants Williams under a contract with *Rawson,* "which constituted a copartnership as to the said personal property and proceeds from said farm;" that in conducting the farm it was necessary on the part of both the said *Ed Williams* and *Rawson* to borrow a considerable amount of money for the purchase

of stock and feed, and that it was arranged and agreed by and between them and the plaintiff bank that as to the credit extended in the several causes of action such credit should be extended to all of the defendants upon the request of the defendant *Ed Williams* and that he was authorized to give notes and to obligate all of the said defendants.

The plaintiff alleged, upon information and belief, that all the money borrowed upon said notes and for which said notes were given was used in paying for the supplies needed in carrying on the operation of the farm under the copartner arrangement which *Rawson* had with the other defendants, and that he authorized the said money to be borrowed for the said purpose and promised the said plaintiff that he would pay to plaintiff the money and credit so extended to the defendants *Ed Williams* and wife.

The separate causes of action were for promissory notes of the dates and amounts as follows (for brevity the signers of such respective notes are indicated by the letters "W" where signed by defendant *Williams,* and "Mrs. W.," his wife). All were at seven per cent.:

*First Cause.*

1919, Mch. 28.  Two mos.  W. ..................... $109 23
Indorsement, March 28, 1920, "Interest paid to date."

*Second Cause.*

1919, July 15.  Six mos.  W. and Mrs. W. ........... $300 00
Indorsement, October(?) 25, 1920, "Interest paid to July 15, 1920."

*Third Cause.*

1919, Aug.  8.  Six mos.  Mrs. W. ................... $50 00
Interest paid to August 8, 1920.
This was alleged to be on her own behalf and as agent for *Rawson.*
This cause was withdrawn on the trial.

*Fourth Cause.*

1919, Aug. 30.  Three mos.  Mrs. W. (as in the third cause) ........................... $53 15
Interest paid to August, 1920.
This note was the subject of the third and fourth questions of the special verdict and is not included in the judgment.

*Fifth Cause.*

1919, Sept. 6. Six mos. Mrs. W. and W. ............. $650 00
Interest paid to September 6, 1920.
This cause of action was also dismissed
by the plaintiff on the trial.

*Sixth Cause.*

1919, Oct. 1. Thirty days. W. ..................... $185·74
Indorsed October 25, 1920, "Interest paid
to October 1, 1920."

*Seventh Cause.*

1919, Oct. 25. Six mos. W. and Mrs. W. ............. $100 00
Indorsed October 24, 1920, "Interest paid
to October 25, 1920."

*Eighth Cause.*

1920, Mch. 16. On demand. W. ..................... $577 54
No indorsement or admission of payment
of interest.

*Ninth Cause.*

1920, Mch. 20. Six mos. W. ....................... $290 51
With no indorsement or admission of pay-
ment of interest.

*Tenth Cause.*

1920, Apr. 8. Six mos. W. ....................... $233 95
No indorsement or admission of interest.

*Eleventh Cause.*

1920, May 5. Six mos. W. and Mrs. W. ............. $511 45
No indorsement or admission of interest.

(All of the above notes were taken by the
plaintiff during a period while one Pier
was cashier, with whom was negotiated
the $600 note of January 31, 1919.)

*Twelfth Cause.*

1921, Oct. 19. Demand. W. and Mrs. W. ............. $720 72
With no indorsement or admission of in-
terest payment.

(This last note, under the testimony of
the cashier of plaintiff bank who suc-
ceeded Pier, was to take up a then
existing overdraft against *Williams.*)

October 1, 1919, a number of such notes being then out-
standing and unpaid, a chattel mortgage was given to Pier
for the bank by the defendants *Ed Williams* and wife to
secure the payment of $1,623.12 and on their undivided
one-half interest in the personal property on said farm which

they owned with said *Rawson* and on their entire interest in certain other personal property of theirs, also on said farm.

November 26, 1921, the defendant *Rawson* wrote to plaintiff bank with reference to a shipment of hogs that had been made from the farm by *Williams,* stating that one half of such shipment was his and that the pay for the same should be left at the plaintiff bank, and requesting the bank to send him draft for the same. This letter was returned with a written statement on the back by the bank cashier showing that $237.81 was the net proceeds of such sale, and that defendant *Rawson's* share was $118.90, for which amount, less exchange, a draft for $118.80 appears to have been sent by the bank to defendant *Rawson.*

Defendant *Rawson* also kept an individual account with the plaintiff bank with the following deposits:

| | | |
|---|---|---|
| 1919, Feb. 1. One half of the proceeds of the $600 note *supra* ............ | $300 | 00 |
| 1919, June 10. ........................... | 100 | 00 |
| 1919, Dec. 15. ........................... | 194 | 85 |
| 1920, Feb. 16. ........................... | 256 | 50 |
| 1921, Nov. 26. (This is the proceeds from sale of hogs *supra*) ............ | 118 | 90 |

No conversation was had at any time subsequent to January 31, 1919, when the $600 note was negotiated, between any officer of the plaintiff bank and defendant *Rawson.*

In March, 1920, *Rawson* and the Williamses were discussing the continuing of the arrangement concerning the farm, and according to the testimony of defendant *Williams* he declared that, unless the same arrangement was made by which credit could be obtained for the purchase of the necessary feed and supplies for carrying on the farm, they could not continue, and that it was then agreed between himself and *Rawson* that he, *Williams,* should arrange if possible with the plaintiff bank for further credit and that

*Rawson* was to assume responsibility for the same. The cashier of the bank testifies that such alleged arrangement was reported to him at that time by *Williams* and that he agreed to furnish further credit.

Up until after the giving of the last note sued upon of October 19, 1921, there had been no notice or information given by the plaintiff bank or by the defendant *Williams* to defendant *Rawson* that any of such twelve notes had been given; were due and outstanding; that interest was due on any of them; had been paid or payment of interest demanded.

On the trial the cashier testified that at the original request for money on the $600 note in January, 1919, he told both *Rawson* and *Williams* that they would both have to sign the note, that there were no arrangements made at that time as to how the loans made in the future would be secured, and that he then told both *Rawson* and *Williams* that they could have money to buy feed to carry them through. Also, in substance, that *Mr. Williams* was to borrow the money; he, *Williams,* was to buy the feed and give a note for it; the bank was to take his note and furnish the money to him for the purchase of the feed; that his understanding was that they were jointly liable.

Defendant *Williams* testified that a large amount but not all of the proceeds of the notes for which judgment was entered was expended for feed and in connection with the running of the farm.

The statements rendered by the Williamses to plaintiff showed the receipts and payments would carry forward the balance due *Rawson* as it was during all of the year 1919 and until February, 1920, as high at one time as $95. In February, 1920, a balance of $110.92 was shown due *Williams* after charging the account with a payment of $318 for corn.

In March, 1920, after charging for the purchase of a bull for $175, hay at $172, a balance was then claimed due

*Williams* of $290.06. In August about the same; and in January, 1921, which is the last statement appearing in the record, the receipts of the farm were given as nothing, and there was paid out, and apparently for corn, $195, and one half of the payments in that month added to the balance claimed due *Williams* totaled $426.59, and following this item is the statement, "and indorsed on note." (But what this note was does not appear.) Purchases of oats and feed appeared at other times.

Pleadings were interposed between the defendants, but the verdict of the jury was only upon the issues raised between the plaintiff and defendant *Rawson;* *Rawson* denying, by answer and in his testimony, having made any such agreements as were the basis of plaintiff's claims.

The court submitted a special verdict in substance as follows:

(1) Was it agreed January, 1919, between the bank and defendants Williams and *Rawson* that the plaintiff bank was to extend credit to the defendants upon the request of *Williams* and that each of the said defendants was to be liable for the payment of the notes? *A.* Yes.

(2) Were the notes given to the bank by defendant *Williams* as described in all of the causes of action except the third, fourth, and fifth given for credit so extended pursuant to that agreement? *A.* Yes.

(The third and fourth questions concerned the note for $53.15 signed by Mrs. Williams, but, the jury answering to the effect that she had no authority from *Rawson* to give such note as his agent, no judgment was entered as to such note.)

(5) Was it agreed between defendants Williams and *Rawson* that in the operation of the farm *Williams* was authorized to borrow money upon their joint account and each of them to pay one half of the amount so borrowed? *A.* Yes.

(6) Was the money obtained by the defendant *Williams* on the several causes of action other than the third and fifth used in the payment of the joint obligations of the defendants Williams and *Rawson* in the operation, repairs, and improvements on said farm? *A.* Yes.

After respective motions by the several parties, judgment was directed in favor of the plaintiff bank against the defendants *Williams* and *Rawson* jointly and severally for $3,571.15, principal and interest, with costs, and dismissing the action as to Mrs. Williams.

From such judgment the defendant *Rawson* has appealed.

For the appellant there was a brief by *Munson & Curran* of Prairie du Chien, and oral argument by *A. B. Curran* and *M. R. Munson.*

For the respondent there was a brief by *Graves & Earll* of Prairie du Chien, and oral argument by *J. S. Earll.*

For the defendant *Williams* there was a brief by *Brennan & Carthew* of Lancaster.

ESCHWEILER, J.   In view of the disposition to be made of this case we do not deem it necessary to determine whether the relationship existing between the three defendants by reason of the written agreement between them of January 31, 1919, the substance of which appears in the statement of facts, was one creating a copartnership, a joint adventure, or a lease.   The respondent has contended throughout that the relationship was that of a partnership and that thereby there was created by law the right of *Williams,* as one of such alleged copartners, to bind the appellant, *Rawson,* in the obtaining of the several loans from plaintiff for which judgment below was obtained. We shall, however, express no opinion on this question other than to suggest that such construction of the agreement might be difficult in view of the provision of the Uniform Partnership Act, sub. (4), sec. 1724m—4, Stats., declaring the rules to apply in determining whether a partnership exists, and to the effect that no inference of partnership shall be drawn from the fact of a sharing in profits where such are rent to a landlord.

Judgment should have been entered in favor of defendant *Rawson* dismissing the complaint as to him upon his motion to that effect, for the reason that it clearly appears in this

case that the evidence does not warrant a finding of any original promise by *Rawson* to become jointly or severally liable upon the various promissory notes set forth in the complaint. Such notes were original obligations of the defendants *Ed Williams* and his wife, and any promise or undertaking by *Rawson* to assume liability thereon, even if any such promise had been made, was void under the statute of frauds, sub. (2), sec. 2307, because not in writing.

It is undisputed that the only conversation between the appellant, *Rawson,* and any officer or agent of the plaintiff bank was the one had about January 31, 1919, and at which were present defendants *Rawson* and *Williams* and Pier, the cashier of the plaintiff bank. They all agree that there was then discussed the desire to obtain a present loan of $600 from the bank. It is undisputed that the cashier then insisted that for such loan both *Rawson* and *Williams* were to sign the note, which was so done. Such was a judgment note similar in form with all the ones sued upon here. *Williams* kept but one account at plaintiff bank and in his individual name at this time and subsequently, and into which and from which his individual funds and the farm funds were deposited and checked out. To this fund was credited the $600, proceeds from such loan, *Rawson* being then given and then cashing a check by *Williams* for $300, thereby strongly indicating that as to such loan it was not for the purpose, as claimed by *Williams* and the plaintiff, of carrying on the farm, otherwise such $300 would have been kept in the bank and used for that purpose.

It is undisputed that if any arrangements were then made for future credits to *Rawson* through *Williams* no writing was asked of *Rawson;* the agreement between *Rawson* and *Williams* for running the farm does not appear to have been examined to determine the relationship thereby created; no provision was made as to kind or form of additional security if any, and there appears a somewhat startling omission to provide as to the maximum amount to which such credit

might be extended. The agreement as to the then loan while *Rawson* was present at the bank was made, at the bank's insistence, with due solemnity and full precautions. As to the much larger credits extended subsequently, there was an entire absence of such precautions by the bank so far as *Rawson* was concerned, yet all such safeguards adopted as to the Williamses.

Plaintiff's version, therefore, as to this original transaction, and upon which it must rely to support the judgment, is strongly discredited at the very outset as a business transaction, and especially so as an exhibition of banking.

Plaintiff's version is completely discredited by the subsequent history of the transaction.

It is undisputed that at no time did the bank notify *Rawson* that judgment notes were being signed by *Ed Williams,* Mrs. Williams, and both (none of them purporting to be partnership or joint obligations so far as *Rawson* was concerned) ; that such notes were falling due or were past due; and no demand on *Rawson* for interest. When over $1,600 was past due in October, 1920, a chattel mortgage was taken for the benefit of the bank from the two Williamses with no suggestion to *Rawson* as to such a situation or request from him for security on his part. The plaintiff bank held funds on deposit in *Rawson's* own account and permitted him to withdraw such funds from time to time as indicated in the statement of facts, and yet, at the time of such withdrawals, the bank was in each instance then holding past-due notes, sued for here, and always in excess of such permitted and unprotested withdrawals.

The plaintiff relies upon the testimony of defendants *Ed* and Mrs. Williams to support the verdict and judgment; the effect of such testimony, however, is completely swept away by their conceded actions. They send to *Rawson* in Iowa from time to time what purport to be statements of the income and outgo of the farm. Not once do they intimate that they have been incurring these obligations to the

bank.  They, during the first year and a half, paid interest on these obligations to the bank and up to October 25, 1920, and as follows:

On the notes included in the judgments here, about    $47 18
On the note of January 31, 1919, for $600......    42 00
On the notes sued for but not included in the
    judgment, about.......................    52 71
                                            _____

A total of interest of at least..............  $140 00

And yet make no claim or charge for any of it in their statements.  Certainly if it was in their contemplation from the start that *Rawson* was sharing their liability as to all or any of these notes, he must have been considered as so sharing as to the interest payments.  Again, their own reports to him show, until February, 1920, a balance of account due him; yet if he were liable with them for this interest, and these notes or any of them, the balance would have been materially different and the other way.  From February, 1920, to January, 1921, inclusive, such reports showed a claimed balance due *Williams* and in the last report of only $426.59; yet at this time their obligations, for which they now assert *Rawson* was jointly liable with them, exceeded $2,300 (excluding the $600 note of January, 1919, and, of course, the last note of October, 1921, of $720.72).

The defendant *Rawson* denied that there was any conversation or agreement at the time of his only interview with the cashier, Pier, about there being any future obligations to be assumed by *Williams* and for which he, *Rawson*, was to become in any wise liable.  He testifies that the sole arrangement at that time was the negotiating the $600 note upon which the cashier insisted his signature should be placed as one of the joint makers.  He also denies that at the time of his visit in March, 1920, he authorized or empowered *Williams* to make loans at the bank.  It is an undisputed fact that even at that time *Williams* did not inform

*Rawson* of the large number and amounts of the then outstanding and past-due obligations.

Under all these facts and circumstances we are compelled to say that the verdict of the jury upon which the judgment of the court below was founded is so unsupported by any credible evidence that the verdict and judgment must be set aside.

Were we not so compelled to reverse on the merits, still the plaintiff could not recover against defendant *Rawson* because the evidence of plaintiff's cashier on its behalf, and who transacted the bank's business with defendants as to all the notes save the one of October, 1921, demonstrates that the respective loans here involved were to the defendants Williams as primary obligors, and that the liability of *Rawson,* if any, was but secondary and therefore void under the statute, sub. (2), sec. 2307, *supra,* and well within such decisions as *Klee v. Stephenson,* 130 Wis. 505, 110 N. W. 479; *Parry v. Spikes,* 49 Wis. 384, 5 N. W. 794; *Rietzloff v. Glover,* 91 Wis. 65, 64 N. W. 298; *Richardson Press v. Albright,* 224 N. Y. 497, 121 N. E. 362; *Bugbee v. Kendricken,* 130 Mass. 437.

*By the Court.*—Judgment reversed, with directions to dismiss the complaint as against the appellant, *Rawson.*

